3009.   SOUTHERN RAILWAY CO. *v.* CAMPBELL.

1. A railroad company in the operation of its trains owes to a trespasser upon its tracks no duty, save that of not injuring him wilfully or wantonly.
2. The evidence shows that the homicide was not wilfully or wantonly committed.

DECIDED JULY 25, 1911.

Action for damages; from city court of Hall county—Judge Looper.   October 5, 1910.

*Ed.   Quillian, C. R. Faulkner, John J. Strickland,* for plaintiff in error.

*R. R. Arnold, Howard Thompson,* contra.

RUSSELL, J.   The plaintiff, Mrs. Tinie Campbell, brought suit against the Southern Railway Company to recover damages for the homicide of her son, A. C. Campbell, upon whom she alleged she was dependent.   It appears that he was killed by a train of the defendant on November 27, 1908.

It appears from the record that a negro preacher named Pittman, on his way to the depot of the defendant at New Holland, to purchase a ticket to Alto, Ga., saw Campbell sitting on one side of the railroad track, with his feet in the center of the track, and with his hands between his knees and his head down. Pittman was crippled and was hurrying, because train No. 12, which he intended to board, was almost due. As he passed, according to his testimony, he said to Campbell, "It is nearly train time, and you had better get up from there. The train will be along directly." Pittman testified that he was about 40 feet from Campbell when he spoke, and he spoke loud enough to be heard, though he did not stop walking; that he was trying to make connection with his train; that he looked back, and, as Campbell had not moved, he spoke again, saying, "It is nearly train time, and you had better get up." Campbell never moved at all. It appears that Pittman proceeded to the depot and told several parties who were at the depot door and in the waiting room: "Yonder sits a man up there on the railroad track, and I spoke to him twice, and he did not move, and if he sits there long the train will get him." He then went on to the depot agent, who was inside the ticket office, writing. After calling for a ticket to Alto, Pittman told the agent: "There is a man sitting up there on the railroad track, and I spoke to him twice, and he did not give me any attention." The agent said, "Where?" and Pittman said, "Up yonder right on the railroad, just above the crossing." Just as the agent "struck" his ticket and handed him back his change, Pittman said, as he turned his back to the window, he saw the freight train coming in the cut away up there, and remarked, "Yonder comes the train now."

Other witnesses testified that as the train came in sight all the people out there were giving signs to the engineer; some threw up their hands, some waved their hats, and some their handkerchiefs. According to the testimony, the engineer saw the signals given him by the bystanders, but the train proceeded on its way. The deceased did not move, and was killed by the collision of the pilot of the engine with his body. The deceased was killed about 250 yards north of the station, and there was testimony to the effect that a person could see nearly a half mile from the point where the railroad track emerged from the cut to the point where

the young man was killed, though it was admitted by these witnesses, on cross-examination, that an engineer sitting on his engine could hardly distinguish a man or any object on the ground at the point where the deceased was killed, because, on account of the curve, the boiler would be between him and any object on the track at that point. In the main there is no conflict in the testimony.

It is apparent that almost immediately after the agent and several bystanders at the depot were notified by Pittman of Campbell's being upon the track, the freight train, composed of 23 cars, came in sight, running at a rate variously estimated as from 30 to 40 miles an hour. It was running down-grade. The witness Lewis, who was very specific in his testimony, says that when he first saw the train coming it was about 650 yards away. This freight train was to be followed, and was followed immediately, by a passenger train, No. 12, which was the train upon which passengers were intending to enter and did take passage. After the engine passed the depot, where the crowd made signals to the engineer to stop, and when it had reached a point about 150 yards from where Campbell was sitting, the engineer gave three short whistles and applied the air-brakes, but the train was not stopped until it had passed at least 50 to 75 feet beyond the point where the body lay, or about 100 or 125 feet from where the engine hit the man.

According to the testimony of the company's employees (of whom there were three upon the engine), as the train approached New Holland, running about 30 miles an hour, and when the engine came within 150 yards of the depot, there were several in the yard, and the engineer was blowing his fancy whistle, and there were two or three out there waving their hands, on the fireman's side. It is customary for crowds to gather around a station, though not necessarily waving their hands. Those were not any kind of signals at all. The waving of the hands is not a stop signal. A stop signal is backward and forward. According to their testimony, the employees with the crowd were just out there "cutting up," and there was no signal that was recognized as a danger signal or a stop signal. The waving of hands and throwing up the hats began when the engine was about 150 yards from the station. They testified that when they got even

with the office some one pointed north of the depot, and the engineer and the fireman looked in that direction, and discovered some one lying on the track about 100 yards ahead of the train. The engineer applied air in emergency and tried to stop the train. He put on the emergency first, and then blew the alarm signal. The air was working in good condition and everything was done that could be done to stop the train. The engineer used sand and reversed the engine before he got to where this man was lying, but it took about 200 yards to stop the train after he undertook to stop it.

The engineer testified that he was running about 35 miles an hour when he passed the depot at New Holland. When he got close enough to see the people there, he noticed them throw up their hands, two or three of them. He just considered it a kind of salute, a kind of waving at him. "Very frequently we see people doing that while passing stations along a public place, when we pass them near the railroad. Very often I see a man throw up his hands to me, especially those I am acquainted with along the line, and sometimes those I am not acquainted with. There was not anything when I first saw the signal to indicate to me that there was any danger, or trying to stop me; no signals across the track that I saw. The ones I saw were on the left-hand side, the fireman's side. I do not know just exactly how far I was when I saw it—150 to 200 yards. One man crossed over on my side before I passed the depot there. About the time the engine passed the depot or passed the man, he threw his hands up like that, and pointed down that way, and I threw my hands on the throttle and shut the engine off, and at that time the fireman discovered he saw something on the track and called my attention to it, and I applied the air in emergency, reversed the engine, and used sand. When he did that, I did everything possible to stop my train as soon as I could." According to the testimony of the engineer, Campbell was lying down on the track parallel with the rails just before he was struck by the pilot of the engine, and seemed to raise himself and make an effort to get off the track just before he was struck.

The plaintiff testified that her son contributed $100 or more each year toward her support, and that she was dependent upon him to that extent, as her husband was only earning $1 per day.

The jury returned a verdict for $2,000 in favor of the plaintiff. Exception is taken to the judgment refusing the defendant's motion for new trial.

We think that the evidence is sufficient to authorize the conclusion that the plaintiff was dependent upon the deceased, and that he contributed to her support. While there must be both dependence and contribution, we do not think that the fact that the plaintiff's husband was bound for her support, and may have been able to supply her with a maintenance, more meager than that which she received, would preclude the idea of dependence; and the fact that the mother may sometimes have supplied the deceased with small articles, or even advanced to him small sums of money, would not have been sufficient to contradict the fact that he contributed to her support, in view of the evidence that he frequently supplied her with larger sums and with various necessaries of life.

None of the exceptions to the refusal of the court to give instructions which were requested can be sustained; for it appears, from a review of the charge as delivered, that each of the instructions requested was given in charge to the jury. The excerpt in the charge of which complaint is made should, in our opinion have been qualified by an explanation of the term "imminent peril," and the jury should have been told that the liability for gross negligence, which attaches when negligence is tinged with wantonness and wilfulness, would not attach, if the circumstances were such as not to impress the engineer with the belief that the deceased was in imminent peril. In other words, we do not think that it is to be assumed as a matter of course that one who is in front of an engine upon a railroad track is necessarily in imminent peril. On the contrary, the natural presumption would seem ordinarily to be that such a one would get off the track before the train would reach him. But it is not necessary for us to pass upon this question, in view of the ruling of the Supreme Court in *Atlanta Railway & Power Co.* v. *Walker*, 112 *Ga.* 725 (38 S. E. 107).

Conceding that the depot agent could have made more exertions to avert the terrible catastrophe which overtook the deceased, and that the engineer was negligent in not attempting to stop the train when the bystanders first signaled or waved to him, the real question in this case is, Do the facts show that the killing of the

deceased was wanton and wilful? In other words, conceding that both of the agents of the company were negligent, is the negligence so gross as to lead to a fair and reasonable inference that it must have been induced by recklessness amounting to wantonness? While neglect, in some cases, may be so gross as to warrant the presumption that it was wanton, and thus authorize the inference that the act was wilful, still this is a matter to be determined in the light of all the circumstances, and especially in the light of the minds of the actors in the casualty.

Let us look at the facts of the case at bar, in the first place, as to the depot agent. There can be no negligence, unless the person charged with neglect owes a duty toward the object of the negligence. The depot agent owed Mr. Campbell no duty. Of course, if it had been possible for the agent, in the exercise of humanity, to do anything to remove Campbell from the track, morally and personally it would have been his duty to do so. But when it is said that his negligence amounts to wantonness, and when it is sought to charge the defendant company with liability for his act, it must be remembered that this agent is a special agent charged with special duties, and that the company is not liable either for his negligence or for any overt act committed, except within the scope of his duties. This principle is clearly stated in the case of *Christian* v. *Columbus Railroad Co.*, 79 *Ga.* 460 (7 S. E. 216), which is cited by counsel for defendant in error, in which the railroad company was held liable, according to the allegations of the petition, for the wrongful homicide of a patron, committed by its depot agent in his office while the customer was lawfully there for the transaction of business with the agent pertaining to his agency. But even in that case the action was allowed to stay in court only because it was alleged in the petition that the railroad company employed the agent knowing that he was insane at the time of his employment; for Judge Bleckley holds that if the homicide was the result of insanity, and the railroad company was faultless in regard to employing the agent, anything which would excuse the agent criminally for the act would excuse the railroad company civilly.

Was it the duty of the depot agent as a servant of the railroad company, employed for the special purpose of selling tickets at that particular time, to remove trespassers from the tracks, and was

the statement of Pittman sufficient to give notice to the agent of the company that Campbell was in fact in peril? The statement that Campbell did not move when the negro Pittman called to him does not carry to our minds the conclusion that he was unable to move, and was therefore in peril. The bystanders notified by Pittman at the door of the depot could see Campbell, and, so far as the instincts of humanity were concerned, their duty as well as their natural impulse to save him harmless was as great as that of the agent of the railroad company. Evidently, therefore, the bystanders did not consider him to be in peril, because none of them made any effort to remove him from the track. So far as the depot agent is concerned, he is employed for the specific purpose of selling tickets at those periods or particular times when passengers desire to take passage. He is not charged with any duties towards those who may be trespassing upon the railroad tracks.

It is most lamentable that the plaintiff's son lost his life, but it can not be assumed that it was due merely to negligence, however culpable it may have been, and that this negligence amounted to wantonness and wilfulness, unless the negligence was that of one of the defendant company's servants charged with some duty in reference to the tracks where the decedent was sitting. The defendant's depot agent could not in any view owe a duty towards the deceased as a trespasser, before discovering his peril; and, as we view it, there was not sufficient evidence to put him on notice that the deceased was in peril. But even if the notice he received from Pittman had been sufficient to put him on notice that the deceased was in peril, and he endeavored to stop the train, although in a negligent manner or in the wrong way, it was mere negligence or unskilfulness in stopping the train, and it could not be charged against the railroad company as wantonness or wilfulness; because he was not under any duty originally to stop the train at all.

2. As to the engineer, it is perfectly plain that, just as soon as the fact reached his mind and took lodgment that there was a helpless man on the track, he made every effort to stop the train. All his conduct goes toward negativing a reckless or wanton state of mind. It might have been a negligent mistake of judgment for him to have mistaken (and, therefore, to have failed to heed) the

attempt at warning which the bystanders undertook to give by waving their hands and throwing up their hats, but this does not make his act wanton or wilful. The plaintiff failed to show that the defendant's agents acted wantonly or wilfully; the defendant showed that they did not. Hence the verdict is contrary to the law, and it is our plain duty to reverse the judgment.

*Judgment reversed.*